IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ALLIED TITLE LENDING, LLC,
d/b/a ALLIED CASH ADVANCE,
        Appellant,

        v.                                             Civil No. 3:18cv845 (DJN)

SHIRLEY DEAN TAYLOR, *et al.*,
        Appellees.

<u>MEMORANDUM OPINION</u>

On January 15, 2018, Appellee Shirley Dean Taylor ("Taylor") initiated an adversary

proceeding against Appellant Allied Title Lending, LLC ("Allied"), objecting to Allied's

unsecured proof of claim against her bankruptcy estate. On March 29, 2018, Allied moved to

compel arbitration of Counts II and III of Taylor's Amended Complaint, stay the adversary

proceeding and declare Counts II and III as non-core claims pursuant to 28 U.S.C. § 157(b)(3).

On November 20, 2018, the United States Bankruptcy Court for the Eastern District of Virginia

(the "Bankruptcy Court") issued an order denying Allied's Motion, which Allied now appeals.

Allied further appeals the Bankruptcy Court's December 6, 2018 Order granting the Motion to

Intervene filed by Appellee the Commonwealth of Virginia (the "Commonwealth"). On January

28, 2019, Senior United States District Judge Henry E. Hudson consolidated Allied's appeals

into the present action. (ECF No. 8.) This matter now comes before the Court on Allied's

consolidated appeal and Taylor's Motion for Leave to File Supplemental Authority (ECF No.

18). For the reasons set forth below, the Court AFFIRMS the judgment of the Bankruptcy Court

as to both Allied's Motion to Compel and the Commonwealth's Motion to Intervene and

DENIES AS MOOT Taylor's Motion to File Supplemental Authority (ECF No. 18).[1]

## I.    BACKGROUND

The Court reviews the factual findings of the Bankruptcy Court for clear error. *Mar-Bow*

*Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US, LLC*, 578 B.R. 325,

328 (E.D. Va. 2017) (citations omitted). Based on this standard, the Court accepts the following

facts.

### A.    Allied Line of Credit

In July 2016, Taylor applied for a $1,500.00 loan from Allied, an issuer of short-term,

small-dollar, open-end credit plans that resemble payday loans. *Taylor v. Allied Title Lending,*

*LLC (In re Taylor) (Allied I)*, 594 B.R. 643, 645 (Bankr. E.D. Va. 2018). Subsequently, on July

25, 2016, Taylor executed a line of credit agreement with Allied (the "Credit Agreement"),

agreeing to repay a $1,500.00 line of credit with interest accruing at a rate of 0.75 percent per

day, for an annualized interest rate of 273.75 percent. *Id.* at 645-46. The Credit Agreement

provided an interest-free grace period of twenty-eight days and required a $100.00 origination

fee, to which the grace period did not apply. *Id.* at 646.

Relevant here, the Credit Agreement also contained an arbitration provision (the

"Arbitration Provision"), which provided that:

> Before signing this Agreement, you should carefully review the Arbitration
> Agreement located on pages 5 and 6. The Arbitration Agreement provides that all

---

[1]      On September 4, 2019, Judge Hudson referred this case to the undersigned for a Report
and Recommendation in the undersigned's capacity as a United States Magistrate Judge. (ECF
No. 20.) Subsequently, on October 16, 2019, the United States Senate confirmed the
undersigned as a United States District Judge, and the undersigned was sworn in to the position
on October 18, 2019. Thereafter, Judge Hudson transferred this matter to the undersigned. (ECF
No. 21.) Accordingly, the undersigned resolves Allied's consolidated appeal in his capacity as a
United States District Judge.

Claims arising from or relating to this Agreement or any other agreement that you and we have ever entered into must be resolved by binding arbitration if the person or entity against whom a Claim is asserted elects to arbitrate the Claim. Thus, if the person or entity against whom you assert a Claim elects to arbitrate the Claim, then you will not have the following important rights:

- You may not file or maintain a lawsuit in any court except small claims court.

- You may not join or participate in a class action, act as a class representative or a private attorney general, or consolidate your Claim with the claims of others.

- You will have to pay the arbitration firm certain fees in order to commence an arbitration proceeding, unless you ask us to pay those fees to the arbitration firm for you.

- You give up your right to have a jury decide your Claim.

- You will not be afforded the procedural, pre-trial discovery and appellate rights in an arbitration proceeding.

If you do not want to arbitrate all Claims as provided in the Arbitration Agreement, then you have the right to reject the Arbitration Agreement. To reject arbitration, you must deliver written notice to us at the following address within 30 days following the date of this Agreement: Allied Cash Advance, Attn: Arbitration Opt-Out, P.O. Box 36381, Cincinnati, Ohio 45236. Nobody else can reject arbitration for you; this method is the only way you can reject the Arbitration Agreement. Your rejection of the Arbitration Agreement will not affect your right to credit, how much credit you receive, or any contract term other than the Arbitration Agreement.

*Id.*

## B.    Bankruptcy Proceeding

On January 17, 2017 (the "Petition Date"), Taylor filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code (the "Bankruptcy Case"). *Allied I*, 594 B.R. at 646. On March 21, 2017, Allied filed proof of claim 8-1 ("Claim 8-1") in the Bankruptcy Case, asserting an unsecured claim totaling $2,756.92 against Taylor's bankruptcy estate. *Id.* In response, on August 29, 2017, Taylor filed her initial objection to Claim 8-1, alleging that Allied had "'neither attached a copy of the writing upon which the claim is based nor a statement of the

3

circumstances of the loss or destruction of such writing' in contravention of Rule 3001 of the

Federal Rules of Bankruptcy Procedure." *Id.* (quoting (Obj. to Claim No. 8-1 & Mem. in Supp.

Thereof ¶ 13, *In re Taylor*, No. 17-30142-KRH, ECF No. 29)). Thereafter, on September 1,

2017, the Bankruptcy Court entered an order confirming Taylor's Chapter 13 plan. *Id.* (citing

(Order Confirming Plan (No. 17-30142-KRH, ECF No. 31))).

On September 28, 2017, Cerastes, LLC ("Cerastes"), filed a transfer of claim, indicating

that Allied had transferred Claim 8-1 to Cerastes. *Id.* at 647 (citing (Transfer of Claim Other

Than Security (No. 17-30142-KRH, ECF No. 38))). Cerastes also filed both an amended proof

of claim ("Claim 8-2"), which included the writing upon which Claim 8-1 was based, and a

response to Taylor's initial objection, arguing that Claim 8-2 mooted Taylor's objection to Claim

8-1. *Id.* (citing (Resp. to Obj. to Claim No. 8-1 (No. 17-30142-KRH, ECF No. 40) ¶ 11)).

### C. Adversary Proceeding

On January 15, 2018, Taylor filed a complaint against Allied and Cerastes. *Allied I*, 594

B.R. at 647 (citing (Compl. Objecting to Claim No. 8-1 & 8-2 (*Taylor v. Allied Title Lending,*

*LLC*, Adv. Pro. No. 18-03003-KRH, ECF No. 1))). In response, on January 25, 2018, Allied

filed notice that Cerastes had transferred Claim 8-2 back to Allied. *Id.* (citing (Transfer Claim

Other Than Security (17-30142-KRH, ECF No. 57))). Allied and Cerastes also filed motions to

dismiss or, in the alternative, to stay the adversary proceeding. *Id.* (citations omitted).

On March 15, 2018, Taylor filed her Amended Complaint, setting forth five counts for

relief against Allied and Cerastes. *Id.*; (Am. Compl. Objecting to Claim No. 8-1 & No. 8-2

("Am. Compl.") (Adv. Pro. No. 18-03003-KRH, ECF No. 23).) In Count I, Taylor objected to

Claims 8-1 and 8-2 (the "Claims"), because: (1) Allied charged fees and interest on Taylor's

credit line after the Petition Date; (2) Allied failed to identify the Claims as open-end credit lines;

4

and, (3) Claim 8-2 falsely asserted that no interest or fees had been assessed on the credit line after the Petition Date. (Am. Compl. ¶ 77.)

In Count II, Taylor argued that the Claims should be disallowed pursuant to 11 U.S.C. § 502(b)(1), because Allied and Cerastes "knowingly filed Proofs of Claim on null and void loans, or loans on which interest cannot be charged." (Am. Compl. ¶ 87.) Specifically, Taylor alleged that the Credit Agreement violated Virginia's usury statute, voiding the Agreement and precluding Allied or Cerastes from collecting on the debt underlying their Claims. (Am. Compl. ¶¶ 89-101.) Taylor further alleged that the Claims violated Bankruptcy Rule 3001, because Allied failed to provide the writing or the information required for a claim based on open-end credit. (Am. Compl. ¶ 102.) Taylor raised her objection in Count II on behalf of herself and a putative class of "[a]ll debtors in the Bankruptcy Court . . . who, before filing bankruptcy, entered into a credit agreement with Allied based upon a purportedly open-end credit basis, and a claim was filed regarding that agreement." (Am. Compl. ¶ 79.)

In Count III, Taylor brought a claim against Allied on behalf of herself and a putative class of debtors who, before filing for bankruptcy in the Bankruptcy Court, "entered into a credit agreement with Allied based upon a purportedly open-end basis," alleging that Allied's open-end credit plans violated Virginia's usury and consumer finance statutes. (Am. Compl. ¶ 105-16.) In Count IV, Taylor alleged that Cerastes violated the Fair Debt Collection Practices Act by using false, misleading and deceptive representations in the collection of a debt. (Am. Compl. ¶ 129.) Taylor raised Count IV on behalf of herself and a putative class of debtors in the Bankruptcy Court in whose bankruptcy case Cerastes asserted that "it was the assignee of a claim based on an Allied extension of credit." (Am. Compl. ¶ 118.) Finally, in Count V, Taylor requested equitable relief pursuant to 11 U.S.C. § 105 and Bankruptcy Rule 3001. (Am. Compl. ¶ 138-49.)

Based on these Counts, Taylor asked the Bankruptcy Court to: (1) disallow the Claims; (2) certify the classes in her three class claims (Counts II, III and IV) and appoint her and her counsel as representatives of the classes; (3) disgorge any amounts paid to Allied by the classes in Counts II and III; (4) award monetary damages pursuant to Va. Code § 6.2-304 and the FDCPA; (5) award fees and costs; and, (5) grant declaratory and injunctive relief. (Am. Compl. at 31-32, Demand for Relief.)

In response to Taylor's Amended Complaint, on March 29, 2018, Allied filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *Allied I*, 594 B.R. at 647; (Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) & 12(b)(6) & Mem. of P. & A. (Adv. Pro. No. 18-03003-KRH, ECF No. 35).) The same day, Allied also filed its Motion to Compel, moving the Bankruptcy Court to compel arbitration pursuant to the Arbitration Provision of the Credit Agreement, stay the adversary proceeding and declare that Counts II and III of the Amended Complaint constitute non-core claims. *Allied I*, 594 B.R. at 647; (Mot. for Entry of Orders (I) Staying Adv. Pro. & Compelling Arb. & (II) Determining Class Action Claims in this Pro. Are Non-Core Pursuant to 28 U.S.C. § 157(b)(3) (Adv. Pro. No. 18-03003-KRH, ECF No. 35).) After receiving Taylor's filings in response, the Bankruptcy Court scheduled a hearing on Allied's Motions for July 24, 2018. *Id.*

Before the July 24, 2018 hearing, Allied filed a motion asking the Bankruptcy Court to certify the questions of state law raised in Counts II and III to the Supreme Court of Virginia. *Id.* During the July 24, 2018 hearing, the Bankruptcy Court granted Allied's Motion for Certification, entering an Order of Certification on August 20, 2018. *Id.* at 648-49 (citing (Order of Certif. to Supreme Ct. of Va. (Adv. Pro. No. 18-03003-KRH, ECF No. 78).) On August 31, 2018, the Supreme Court of Virginia declined to consider the certified questions; accordingly,

6

the Bankruptcy Court scheduled a second hearing on Allied's Motions for November 15, 2018. *Id.* at 649.

In the meantime, on November 8, 2018, the Virginia Attorney General on behalf of the Commonwealth filed a motion to intervene in the adversary proceeding, alleging that the Commonwealth met the criteria for intervention under Federal Rule of Civil Procedure 24(b) as incorporated by Bankruptcy Rule 7024. *Id.* (citing (Commonwealth's Mot. for Leave to File Pleadings in Intervention ("Mot. to Intervene") (Adv. Pro. No. 18-03003-KRH, ECF No. 108))). In support of its Motion to Intervene, the Commonwealth filed its Proposed Complaint, seeking to prevent Allied from collecting on its open-end credit plans in bankruptcy court, because those plans violated Virginia's consumer finance and usury statutes. *Id.* (citing (Ex. A to Mot. to Intervene ("Proposed Compl.") (Adv. Pro. No. 18-03003-KRH, ECF No. 108-1) at 2)). The Commonwealth also sought restitution of any principal, interest or other costs paid to Allied from its allegedly unlawful credit plans. (Proposed Compl. at 12.) Allied filed a preliminary objection to the Commonwealth's Motion to Intervene on November 13, 2018. *Id.* (citing (Allied's Prelim. Obj. & Reserv. of Rights Regarding the Commonwealth's Mot. for Leave to File Pleadings in Intervention ("Prelim. Obj.") (Adv. Pro. No. 18-03003-KRH, ECF No. 109))).

During the November 15, 2018 hearing, after entertaining the arguments from all parties, the Bankruptcy Court granted the Commonwealth's Motion to Intervene and denied Allied's Motion to Compel, taking Allied's Motion to Dismiss under advisement and granting Cerastes's Motion to Dismiss as to Count V of the Amended Complaint. *Id.* The Bankruptcy Court thereafter issued two memorandum opinions explaining its decisions on Allied's Motion to Compel, *Allied I*, 594 B.R. at 649-55, and the Commonwealth's Motion to Intervene, *Taylor v.*

7

*Allied Title Lending, LLC* (*In re Taylor*) (*Allied II*), 2019 WL 103775, at *1-3 (Bankr. E.D. Va. Jan. 3, 2019), both of which Allied now appeals to this Court.

### D. *Allied I*: Motion to Compel

In *Allied I*, the Bankruptcy Court denied Allied's Motion to Compel, because referring Counts II and III of Taylor's Amended Complaint to arbitration "would conflict with the essential purpose of the bankruptcy process to quickly and effectively resolve claims against [Taylor's] estate and also would undermine the Virginia Attorney General's statutory prerogative to intervene in this Adversary Proceeding." 594 B.R. at 649-50.

In support this conclusion, the Bankruptcy Court relied primarily on *Moses v. CashCall*, in which the Fourth Circuit recognized that sending a constitutionally core claim to arbitration would "'inherently conflict with the purposes of the Bankruptcy Code.'" *Id.* (quoting 781 F.3d 63, 72 (4th Cir. 2015)). The Bankruptcy Court found the facts in *CashCall* "strikingly similar" to Taylor's claims, noting that the debtor in *CashCall* also challenged the loan agreement underpinning the creditor's claim as illegal and void under state law. *Id.* at 651 (citing *CashCall*, 781 F.3d at 68). Based on the Fourth Circuit's holding that the *CashCall* debtor's challenge to the loan's validity under state law constituted a constitutionally core claim, the Bankruptcy Court held that Taylor's challenge in Counts II and III to the validity of the Credit Agreement under Virginia's consumer rights and usury statutes likewise constituted constitutionally core claims, the referral of which to arbitration would inherently conflict with the purposes of the Bankruptcy Code. *Id.* at 653-54.

The Bankruptcy Court further denied Allied's Motion to Compel, because referring Counts II and III to arbitration "would hinder the ability of [the Virginia Attorney General] to pursue the relief it is statutorily charged with seeking." *Id.* at 654. Specifically, because the

Bankruptcy Court granted the Commonwealth's Motion to Intervene, the Bankruptcy Court

reasoned that referring Counts II and III to arbitration would "undermine the Virginia Attorney

General's statutory function and infringe upon the Virginia Attorney General's right to pursue

the remedies afforded to it by law." *Id.* at 654-55.

### E. *Allied II*: Motion to Intervene

In support of its decision to grant the Commonwealth's Motion to Intervene, the

Bankruptcy Court first found that the Commonwealth had timely filed its Motion and that the

parties would not be prejudiced by the Commonwealth's intervention. *Allied II*, 2019 WL

103775, at *2. The Bankruptcy Court noted that the Commonwealth filed its Motion early on in

the adversary proceeding, before Allied or Cerastes had filed answers to the Amended Complaint

and before the start of discovery. *Id.* The Bankruptcy Court further noted that the Virginia

Attorney General had initiated "an almost identical state court lawsuit against Allied," which

predated the adversary proceeding, meaning there would be no resulting delay from the

Commonwealth's intervention. *Id.* The Bankruptcy Court added that permitting intervention

would in fact reduce the risk of prejudice to the parties by avoiding inconsistent results in state

and federal court. *Id.*

Having found the Commonwealth's Motion timely and nonprejudicial, the Bankruptcy

Court turned to the question of whether the Commonwealth's proposed claims shared a common

question of law or fact with Taylor's Amended Complaint. *Id.* at *3 (citing Fed. R. Civ. P.

24(b)(1)(B)). Because both the Commonwealth's Proposed Complaint and the Amended

Complaint alleged that Allied's open-end credit plans violated Virginia's consumer finance

statutes, the Bankruptcy Court found that the Commonwealth satisfied the requirements for

permissive intervention under Federal Rule of Civil Procedure 24(b). *Id.* Accordingly, the

Bankruptcy Court granted the Commonwealth's Motion to Intervene. *Id.*

## II.    STANDARD OF REVIEW

"When reviewing a decision of the bankruptcy court [rendered in a core proceeding], a

district court functions as an appellate court and applies the standard of review in federal courts

of appeals." *Paramount Home Entm't Inc. v. Circuit City Stores, Inc.*, 445 B.R. 521, 526-27

(E.D. Va. 2010) (citing *In re Webb*, 954 F.2d 1102, 1103-04 (5th Cir. 1992)). Specifically,

"[t]he district court reviews the bankruptcy court's legal conclusions *de novo* and its factual

findings for clear error." *Mar-Bow Value Partners, LLC*, 578 B.R. at 328 (citing *In re Harford*

*Sands Inc.*, 327 F.3d 637, 639 (4th Cir. 2004)). Clear error exists when the district court "'is left

with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting

*Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). In cases involving questions of law and

fact, the Court reviews findings of fact under the clearly erroneous standard and reviews *de novo*

the legal conclusions derived from those facts. *Gilbane Bldg. Co. v. Fed. Reserve Bank of*

*Richmond*, 80 F.3d 895, 905 (4th Cir. 1996).

Conversely, if the proceeding before the Bankruptcy Court constitutes a non-core

proceeding and the parties did not consent to the Bankruptcy Court's jurisdiction, "the district

court . . . undertake[s] de novo analysis of both the factual findings to which [the appellant]

objected and the law." *Humboldt Express Inc. v. Wise Co. (In re Apex Express Corp.)*, 190 F.3d

624, 630 (4th Cir. 2015).

Case 3-18-03002-dob Doc 145 Filed 10/22/19 Entered 10/22/19 14:39:29 Page 11 of 43
Case 3:18-cv-00845-DJN Document 22 Filed 01/10/20 Page 11 of 38 PageID# 2043
Document     Page 11 of 38

# III.   ANALYSIS

## A.   Motion to Compel

In support of its appeal, Allied first argues that the Bankruptcy Court erred in concluding that Counts II and III constitute constitutionally core claims. (Br. of Appellant ("Allied Br.") (ECF No. 12) at 19-20.) Specifically, because Taylor seeks monetary relief in both Counts II and III, including damages, restitution, disgorgement and attorneys' fees, Allied contends that "[r]esolution of these claims will have no bearing on the allowance or disallowance of Allied's Proof of Claim," rendering both Counts constitutionally non-core. (Allied Br. at 20, 30-32.) Because the resolution of constitutionally non-core claims in bankruptcy court rarely overcomes the strong presumption favoring the enforcement of arbitration agreements, Allied argues that the Court should reverse the Bankruptcy Court's denial of its Motion to Compel. (Allied Br. at 20, 32-33.) Ultimately, Allied avers that the Bankruptcy Court "focused too heavily on the Amended Complaint's language objecting to Allied's Proof of Claim on the grounds that the Credit Agreement is void under Virginia law" and should have instead looked at "the relief Taylor seeks." (Allied Br. at 33.)

As for the Bankruptcy Court's additional reasoning that referral to arbitration would undermine the Virginia Attorney General's statutory prerogative to enforce Virginia's consumer finance laws, Allied contends that referring Counts II and III to arbitration would have no adverse impact, because the Attorney General "is actively exercising its authority against Allied in the Circuit Court for the City of Richmond, which is the designated forum for civil enforcement actions under Va. Code § 6.2-1537." (Allied Br. at 21, 39-41.)

Taylor responds that the Bankruptcy Court properly applied controlling precedent — namely, the Fourth Circuit's decision in *CashCall* — in finding that Counts II and III of her

Amended Complaint constitute constitutionally core claims whose resolution in the Bankruptcy

Court overrides any presumption favoring arbitration. (Br. of Appellee, Shirley Dean Taylor

("Taylor Br.") (ECF No. 16) at 11-12.) Taylor asserts that Allied asks the Court to apply a

different standard to that espoused by the Fourth Circuit in *CashCall*, requesting that the Court

look to the remedies sought and not whether "'once the bankruptcy judge ruled on the creditor's

proof of claim, nothing remained for adjudication.'" (Taylor Br. at 12 (quoting *CashCall*, 781

F.3d at 71); *see also id.* at 18 (arguing that the core/non-core distinction "is important but not

dispositive," with the efficient reorganization of the bankruptcy estate serving as the primary

objective in deciding motions to compel (citing *CashCall*, 781 F.3d at 83-84 (Gregory, J.,

concurring)).) Because Counts II and III concern the validity of the Credit Agreement, Taylor

contends that the Bankruptcy Court correctly concluded that both claims would "necessarily be

resolved by the [Bankruptcy] Court in the claims allowance process.'" (Taylor Br. at 13, 19-25.)

Taylor adds that Allied waived any right to compel arbitration by twice asking the

Bankruptcy Court to dismiss Taylor's Amended Complaint and by moving to certify the

questions of state law in the Amended Complaint to the Virginia Supreme Court. (Taylor Br. at

13, 27-34.) And Taylor maintains that the Bankruptcy Court appropriately used its discretion to

permit the Commonwealth to intervene and likewise appropriately concluded that enforcing the

Arbitration Provision would undermine the Attorney General's statutory prerogative to enforce

Virginia's consumer finance statutes. (Taylor Br. at 14, 34-37.)

Separately, the Commonwealth responds that the Bankruptcy Court rightly decided that,

as a non-party to the Credit Agreement, the Commonwealth could not be coerced into arbitrating

Counts II and III, and, because the Bankruptcy Court rightly granted its Motion to Intervene, the

Commonwealth reiterates that arbitration would undermine the Attorney General's statutory

prerogative to enforce Virginia's consumer finance statutes. (Br. of Appellee, Commonwealth of

Va. ("Commonwealth Br.") (ECF No. 15) at 14-16.)

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, "establishes 'a liberal federal

policy favoring arbitration agreements.'" *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98

(2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

"At the same time, however, 'Congress intended to grant comprehensive jurisdiction to

bankruptcy courts so that they might deal efficiently and expeditiously with all matters

connected with the bankruptcy estates.'" *CashCall*, 781 F.3d at 71 (quoting *Celotex Corp. v.

Edwards*, 514 U.S. 300, 308 (1995) (internal quotation marks and citations omitted)). When

these two interests conflict, the Supreme Court has instructed "that the party seeking to prevent

enforcement of an arbitration agreement must show that 'Congress has evinced an intention to

preclude waiver of judicial remedies for the statutory rights at issue.'" *Id.* (quoting *Green Tree

Fin. Corp. v. Randolph*, 531 U.S. 79, 90 (2000)). A court of first impression has discretion to

decide whether to compel arbitration in light of Congress's intent, with its decision reviewed for

abuse of that discretion. *Id.* at 71-72 (citations omitted).

Relevant here, the Bankruptcy Court serves as the court of first impression for

constitutionally core claims; whereas, this Court serves as the court of first impression for non-

core claims. *Id.* at 72. Arbitration of constitutionally core claims "inherently conflict[s] with the

purposes of the Bankruptcy Code," and therefore a bankruptcy court is generally well within its

discretion to refuse arbitration of constitutionally core claims. *Id.* at 73. That said, regardless of

the core/non-core distinction, "what matters . . . is whether compelling arbitration for a claim

would inherently undermine the Bankruptcy Code's animating purpose of facilitating efficient

reorganization of an estate through the '[c]entralization of disputes concerning a debtor's legal

obligations.'" *Id.* at 83 (Gregory, J., concurring) (quoting *Phillips v. Congelton, LLC*, 403 F.3d

164, 170 (4th Cir. 2005)).

Based on this legal framework, the crux of the Court's inquiry becomes:  (1) whether

Counts II and III constitute constitutionally core claims, the arbitration of which falls within the

Bankruptcy Court's discretion; and, (2) if the Counts are constitutionally core, whether the

Bankruptcy Court abused its discretion in finding that arbitration of both Counts would

inherently conflict with the Bankruptcy Code's "animating purpose;" or, (3) if the Counts are

constitutionally non-core, whether, in this Court's discretion, arbitration of the Counts would

inherently conflict with the Bankruptcy Code's "animating purpose."

### 1.    *Counts II and III of Taylor's Amended Complaint Constitute Constitutionally Core Claims.*

Whether a claim is constitutionally core presents a question of law subject to *de novo*

review.  *Midland Funding LLC v. Thomas*, 2019 WL 3806640, at *3 (W.D. Va. Aug. 13, 2019)

(citations omitted).  A cause of action is constitutionally core when it "stems from the

bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern v.*

*Marshall*, 564 U.S. 462, 499 (2011).  A bankruptcy estate's state-law counterclaim against a

creditor "would necessarily be resolved in the claims allowance process" when it shares common

questions of fact and law with the creditor's claim(s) and when it "seek[s] to directly reduce or

recoup the amount claimed." *TP, Inc. v. Bank of Am., N.A. (In re TP, Inc.)*, 479 B.R. 373, 385

(Bankr. E.D.N.C. 2012); *see also Pulaski v. Dakota Fin., LLC (In re Pulaski)*, 475 B.R. 681, 688

(Bankr. W.D. Wis. 2012) (noting that "if the debtor's claim can be resolved without considering

the creditor's claim, then the bankruptcy court lacks the constitutional authority to hear the

debtor's claim").  Consequently, "a counterclaim by the bankruptcy estate that seeks affirmative

monetary relief to augment the estate but does not directly modify the amount claimed would not

qualify as a claim to be resolved in ruling on the proof of claim." *TP, Inc.*, 479 B.R. at 385.

Here, in Count II of her Amended Complaint, Taylor objects to Allied and Cerastes's

Claims pursuant to 11 U.S.C. § 502(b)(1), because Allied and Cerastes "knowingly filed Proofs

of Claim on null and void loans, or loans on which interest cannot be charged." (Am. Compl.

¶ 87.) Specifically, Taylor alleges that the Credit Agreement violated Virginia's usury statute,

voiding the Agreement and precluding Allied or Cerastes from collecting on the debt underlying

their Claims. (Am. Compl. ¶¶ 89-101.) Taylor likewise asserts that the Claims violate

Bankruptcy Rule 3001, because Allied failed to provide the writing or the information required

for a claim based on open-end credit. (Am. Compl. ¶ 102.) Taylor presents her objection in

Count II on behalf of herself and a putative class of "[a]ll debtors in the Bankruptcy Court . . .

who, before filing bankruptcy, entered into a credit agreement with Allied based upon a

purportedly open-end credit basis, and a claim was filed regarding that agreement." (Am.

Compl. ¶ 79.)

In Count III, Taylor brings a claim against Allied on behalf of herself and a putative class

of debtors who, before filing for bankruptcy in the Bankruptcy Court, "entered into a credit

agreement with Allied based upon a purportedly open-end basis," alleging that Allied's open-end

credit plans, like the one executed between Allied and Taylor, violated Virginia's usury and

consumer finance statutes. (Am. Compl. ¶ 105-16.)

The Court finds that Count II constitutes a constitutionally core claim. Indeed, in Count

II, Taylor presents a direct objection to the Claims, arguing that they should be disallowed

pursuant to § 502(b)(1), because the Credit Agreement underlying the Claims proves null and

void under Virginia law. Thus, in deciding the validity of the Credit Agreement under Virginia

15

law, the Bankruptcy Court will "directly modify the amount claimed" by Allied. *TP, Inc.*, 479

B.R. at 385. And the fact that Taylor seeks monetary relief for herself and a class of similarly

situated debtors in the Bankruptcy Court does not alter the Court's analysis. For one, Taylor

brings Count II on behalf of herself and a putative class of debtors who have filed for bankruptcy

relief in the Bankruptcy Court after entering a similar credit agreement with Allied and against

whom Allied has also filed a proof of claim. Thus, assuming the Bankruptcy Court certifies the

putative class, adjudication of the class claims will likewise directly modify the amount of the

claims filed by Allied against similarly situated debtors. Moreover, that Taylor and the putative

class that she wishes to represent seek monetary relief in addition to the disallowance of the

claims filed against them by Allied proves inconsequential to the core/non-core analysis. *See In*

*re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 699 (Bankr. N.D. Ill. 2011) (holding that

claim for breach of good faith and fair dealing, though seeking monetary relief, constituted a

constitutionally core proceeding, because the claim "had to be resolved in order to rule on [the

creditor's] claim and determine the amount due on the claim itself").

    As for Count III, the core/non-core inquiry becomes more nuanced. Indeed, Taylor

defined the putative class in Count III as all debtors in the Bankruptcy Court "who, before filing

[for] bankruptcy, entered into a credit agreement with Allied based upon a purportedly open-end

credit basis," excluding the requirement that Allied have filed a proof of claim against anyone in

the class. (Am. Compl. ¶ 106.) To bring Count III as a class claim, Taylor must show that she is

"part of the class and 'possess[es] the same interest and suffer[s] the same injury' as the class

members," requiring Taylor to ignore the fact of Allied's claim against her if she wishes to

represent the putative class. *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403

(1977) (modifications added) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)).

However, Count III nonetheless constitutes a constitutionally core claim, because resolution of Count III, as with Count II, will resolve the validity of the Credit Agreement, directly reducing the amount of Allied's Claims. *In re Olde Prairie Block Owner, LLC*, 457 B.R. at 699; *see also CashCall*, 781 F.3d at 85 (Gregory, J., concurring) (characterizing whether an individual "was owed money by a debtor" as "a classic core claim"). Indeed, if the Bankruptcy Court finds that Allied's open-end credit plans in fact constitute usurious loans, Virginia law provides that such loans "shall be void" and that Allied shall be liable for "any principal or interest paid on the loan[s]." Va. Code § 6.2-1541. Thus, in resolving whether Virginia's consumer finance and usury statutes void the Credit Agreement giving rise to Allied's Claims, the Bankruptcy Court simultaneously resolves Taylor's right — and the right of the putative class that she seeks to represent — to monetary relief, and vice versa. In other words, Virginia law couples the avoidance of a usurious loan with a right to monetary relief.

Moreover, Taylor's assertion in Count III that if the Credit Agreement qualifies as an open-end credit plan under Virginia law, Allied's origination fee nonetheless violates Virginia's open-end credit statute, (Am. Compl. ¶ 110(d)), would likewise constitute a constitutionally core claim, because resolution of it will affect the amount of Allied's Claims, *see* Va. Code § 6.2-1542 (providing that the relief for excess or unauthorized charges shall be a refund of the charges and, in certain cases, payment of a penalty "of twice the amount of any unauthorized or excess charge actually received"). Therefore, Taylor's entire counterclaim in Count III qualifies as a constitutionally core claim.

2.     **The Bankruptcy Court Did Not Abuse Its Discretion in Refusing to Refer
       Counts II and III to Arbitration.**

Because Counts II and III of the Amended Complaint constitute constitutionally core

claims, whether to compel arbitration of those claims fell within the Bankruptcy Court's

discretion. *CashCall*, 781 F.3d at 71-72. Accordingly, on appeal, the Court will review the

Bankruptcy Court's refusal to refer both Counts to arbitration for abuse of discretion. *Id.* In

exercising their discretion to compel arbitration of constitutionally core claims, bankruptcy

courts must consider "whether compelling arbitration for a claim would inherently undermine the

Bankruptcy Code's animating purpose of facilitating the efficient reorganization of an estate

through the 'centralization of disputes concerning a debtor's legal obligations.'" *Id.* at 83

(Gregory, J., concurring) (quoting *Phillips*, 403 F.3d at 170); *see also id.* at 72 (noting that "a

principal purpose of the Bankruptcy Code is to provide debtors and creditors with the prompt

and effectual administration and settlement of the debtor's estate . . . and also to centralize

disputes over the debtor's assets and obligations in one forum" (internal quotations,

modifications and citations omitted)).

Here, the Bankruptcy Court found that referring Counts II and III to arbitration "would

inherently conflict with the purposes of the Bankruptcy Code." *Allied I*, 594 B.R. at 652. In

support of this conclusion, the Bankruptcy Court likened Count II to the debtor's first claim in

*CashCall*, which sought to declare CashCall's loan to the debtor as void pursuant to North

Carolina's usury statute. *Id.* at 653 (citing *CashCall*, 781 F.3d at 69 (per curiam)). Because

"Count II concerns the validity of the very Credit Agreement that undergirds Allied's claim in

the Bankruptcy Case," the Bankruptcy Court reasoned that resolution of Count II "'could directly

impact claims against her estate and her plan for financial reorganization,'" thereby creating a

18

conflict between arbitration of Count II and "Congress's intent in enacting the Bankruptcy Code.'" *Id.* (quoting *CashCall*, 781 F.3d at 72).

As for Count III, the Bankruptcy Court found that Taylor's claims, if proven, would also "invalidate the contract Allied is using as the basis for its claims," thereby resolving "'whether an individual is owed money by the debtor — a classic core claim.'" *Id.* at 654 (quoting *CashCall*, 781 F.3d at 85 (Gregory, J., concurring)). Because the validity of the Credit Agreement determines whether Allied's Claims should be allowed, the Bankruptcy Court concluded that arbitration of Count III "would conflict with Congress's vision of the bankruptcy process." *Id.*

The Court finds that the Bankruptcy Court did not abuse its discretion in refusing to refer Counts II and III to arbitration. Indeed, because resolution of Counts II and III would determine the very validity of Allied's Claims against Taylor's bankruptcy estate, referral of those Counts to arbitration would defeat the "animating purpose" of the Bankruptcy Code to facilitate the efficient reorganization of Taylor's estate through a centralized claims allowance process. *CashCall*, 781 F.3d at 83 (Gregory, J., concurring). By referring Counts II and III to arbitration, or by keeping one and referring the other, the Bankruptcy Court would risk inconsistent results — results that directly impact the reorganization of Taylor's bankruptcy estate. *See id.* at 72-73 (noting that even if a creditor would receive nothing under an already approved reorganization plan, the resolution of the creditor's claim(s) against the bankruptcy estate could still substantially interfere with debtor's efforts to reorganize, because the creditor could subsequently move to modify the reorganization plan). Accordingly, the Bankruptcy Court acted well within its discretion in denying arbitration of Counts II and III.

3.     *The Commonwealth's Intervention, Alone, Does Not Preclude Arbitration of Taylor's Claims; However, the Bankruptcy Court Could Consider the Commonwealth's Interests in Deciding Whether to Compel Arbitration of the Constitutionally Core Claims.*

In denying Allied's Motion to Compel, the Bankruptcy Court also found that compelling arbitration would "infringe upon the Virginia Attorney General's right to pursue the remedies afforded to it by law." *Allied I*, 594 B.R. at 654-55. Allied challenges the Bankruptcy Court's reasoning, arguing that referral of Counts II and III to arbitration would not prevent the Commonwealth from pursuing its claims against Allied in a separate action. (Allied Br. at 40-41.) Indeed, Allied notes that the Commonwealth has already initiated a civil enforcement action against it in state court. (Allied Br. at 41.)

In finding that arbitration would undermine the Attorney General's ability to exercise its statutory prerogatives, the Bankruptcy Court relied primarily on the Supreme Court's holding in *EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002). *Allied I*, 594 B.R. at 654-55. In *Waffle House*, the Supreme Court addressed "whether an agreement between an employer and employee to arbitrate employment related disputes bars the Equal Employment Opportunity Commission (EEOC) from pursuing victim-specific judicial relief . . . in an enforcement action." 534 U.S. at 282. In ruling that arbitration agreements did not preclude the EEOC from seeking victim-specific judicial relief, the Supreme Court reasoned that the EEOC did not ascent to the arbitration agreement in question and therefore could not be bound by the agreement's terms. *Id.* at 294. The Supreme Court added that even seemingly victim-specific relief can vindicate a public interest charged to the EEOC's protection, which would be undermined by compelling arbitration. *Id.* at 295-96.

The Court agrees with the Bankruptcy Court that the holding in *Waffle House* prevents Allied from compelling the Virginia Attorney General to arbitrate Counts II and III; however, the

20

Attorney General's intervention does not preclude arbitration of Taylor's claims. Indeed, *Waffle House* concerned the EEOC's statutory authority to bring enforcement actions on behalf of individual employees and whether in doing so the EEOC became bound to the individual employee's legal obligations. *Id.* at 291. The Supreme Court observed that when the EEOC brings an enforcement action on behalf of an employee, the employee "has no independent cause of action" and cannot prevent the EEOC from pursuing the employee's claims, making the EEOC "the master of its own case." *Id.*; *see also* 42 U.S.C. § 2000e-5(f)(1) (providing that when the EEOC brings a civil enforcement action, aggrieved persons shall have only the right to intervene).

By comparison, the Virginia Attorney General sought and received the right to intervene *alongside* Taylor in pursuing her claims, and therefore did not become the "master of its own case." Indeed, Virginia's consumer finance statutes contemplate that the Virginia Attorney General and individual consumers may bring civil actions separately. *See* Va. Code § 6.2-1537(E) (providing that Attorney General's right to initiate enforcement actions in the name of the Commonwealth does not prevent individuals from maintaining "an action to recover damages or restitution"). Thus, by intervening in Taylor's case, the Attorney General's interests did not replace Taylor's interests — they merely complemented each other — and Taylor remained bound to the Arbitration Provision.

That said, because the Commonwealth intervened, at least in part, to prevent Allied from collecting on allegedly unlawful debts in bankruptcy proceedings, the Bankruptcy Court was within its discretion to consider the Commonwealth's interests in deciding whether to arbitrate

the constitutionally core claims presented in Counts II and III.[2] Accordingly, the Court affirms

the Bankruptcy Court's judgment on Allied's Motion to Compel. Because the Court rules in

favor of Taylor on Allied's Motion to Compel, it denies as moot Taylor's Motion for Leave to

File Supplemental Authority (ECF No. 18).

### B. Motion to Intervene

Allied also challenges the Bankruptcy Court's decision to grant the Commonwealth's

Motion to Intervene. (Allied Br. at 41-48.) Allied lodges six assignments of error in support of

its challenge. First, Allied raises a procedural issue with how the Bankruptcy Court disposed of

the Commonwealth's Motion to Intervene, arguing that the Commonwealth filed its Motion to

Intervene seven days before the November 15, 2018 hearing during which the Bankruptcy Court

granted the Motion. (Allied Br. at 41.) Consequently, Allied contends that it had insufficient

time to file a substantive objection, filing only a "preliminary" objection on November 13, 2018.

(Allied Br. at 41 n.7.) Allied adds that the Commonwealth did not file a motion for an expedited

hearing as required by Local Bankruptcy Rule 9013(H)(3)(c). (Allied Br. at 42.)

Second, Allied contends that the Bankruptcy Court erred by granting the Motion to

Intervene, because the Commonwealth has already initiated a civil enforcement action against

Allied in the Circuit Court for the City of Richmond, rendering the Commonwealth's Complaint

in the adversary proceeding duplicative. (Allied Br. at 42-43 (citing *Commonwealth v. Allied*

*Title Lending, LLC*, Civil Action No. CL 17004286-00 (Va. Cir. Ct., Rich.)).) Because the

Commonwealth has brought "virtually identical" claims against Allied in state court, Allied

---

[2]     Of course, the Bankruptcy Court's primary and dispositive consideration must be whether
compelling Taylor to arbitrate Counts II and III conflicted with the purposes of the Bankruptcy
Code. Because the Court affirms the Bankruptcy Court's conclusion on that point, the Court
does not find error in the Bankruptcy Court also relying on the Commonwealth's statutory
interests as an additional, though non-dispositive, reason to decline arbitration.

argues that the Bankruptcy Court should have denied the Commonwealth's Motion to Intervene in the interest of judicial economy, comity between the federal and state courts and the avoidance of inconsistent results. (Allied Br. at 43.)

Third, Allied asserts that the statutory provision authorizing the Virginia Attorney General to bring enforcement actions for violations of Va. Code § 6.2-1500, *et seq.*, requires that the Attorney General bring those actions in Richmond City Circuit Court. (Allied Br. at 43-44 (citing Va. Code Ann. § 6.2-1537(A)).) Allied avers that, in enacting Va. Code § 6.2-1537, the General Assembly "manifested an intention to strip the federal courts of jurisdiction to hear the claims now advanced by the Commonwealth," which alone warrants denial of the Commonwealth's motion. (Allied Br. at 44.)

Fourth, Allied contends that the Commonwealth lacks Article III standing to bring its claims in the adversary proceeding, because it lacks any interest in Taylor's bankruptcy estate. (Allied Br. at 44.) Allied maintains that parties seeking permissive intervention must also demonstrate standing, including standing independent of the original plaintiffs, for any additional relief sought. (Allied Br. at 44-45.) In its fifth assignment of error, Allied argues that, if the Court finds that Counts II and III should be arbitrated, the predicate for the Commonwealth's intervention "no longer exists." (Allied Br. at 45.) Of course, because the Court affirms the Bankruptcy Court's denial of Allied's Motion to Compel, the Court will not address this assignment of error.

Finally, Allied contends that the Commonwealth fails to establish an independent basis for subject matter jurisdiction, because the Commonwealth's claims do not arise under Title 11, arise in a case under Title 11 which would have no existence outside of Taylor's bankruptcy case, or present claims otherwise related to a case under Title 11. (Allied Br. at 46 (citing 28

U.S.C. §§ 157(b)(1), (c)(1)).)  Allied notes that the Commonwealth seeks the award of monetary

damages to be held by the Commonwealth in trust, which has no relation to Taylor's bankruptcy.

(Allied Br. at 47-48.)

     The Commonwealth responds that Allied ignores "the plain language of Rule 24(b)" of

the Federal Rules of Civil Procedure, which applies to bankruptcy proceedings pursuant to

Bankruptcy Rule 7024.  (Commonwealth Br. at 7.)  The Commonwealth notes that Rule 24(b)

allows for permissive intervention where the intervenor's proposed claims share a common

question of law or fact with the main action and where intervention will not unduly delay or

prejudice the adjudication of the original parties' rights.  (Commonwealth Br. at 7.)

     To that end, the Commonwealth highlights several common questions of law and fact

between its Proposed Complaint and Taylor's Amended Complaint, arguing that any challenges

to the relief sought by the Commonwealth are "better suited for a motion to dismiss the

Commonwealth's Proposed Complaint once it has been filed."  (Commonwealth Br. at 8-9.)  The

Commonwealth also contends that the Bankruptcy Court rightly decided that the Commonwealth

filed a timely motion to intervene that would not cause undue delay or prejudice to the original

parties.  (Commonwealth Br. at 9-10.)

     As for Allied's assertion that it lacks standing to intervene, the Commonwealth responds

that it has standing as a "party in interest" pursuant to 11 U.S.C. § 502(a).  (Commonwealth Br.

at 10-11.)  The Commonwealth maintains that it has an interest "in ensuring that Allied does not

use the bankruptcy forum as a means to collect and retain the monetary proceeds of [its

allegedly] illegal loans."  (Commonwealth Br. at 11.)  The Commonwealth further cites to

*Edmond v. Consumer Protection Division (In re Edmond)*, 934 F.2d 1304, 1306 (4th Cir. 1991),

in which the Fourth Circuit "recognized an attorney general's unique '*parens patriae*' standing

in a bankruptcy matter where creditors have violated state consumer protection acts."

(Commonwealth Br. at 11 (emphasis supplied).)

The Commonwealth likewise refutes Allied's contention that Virginia Code § 6.2-1537

prohibits its intervention in a forum other than Richmond City Circuit Court, arguing that the

crux of its Proposed Complaint seeks to prohibit the collection of void loans through bankruptcy

proofs of claim. (Commonwealth Br. at 12.) As for Allied's arguments regarding subject matter

jurisdiction, the Commonwealth notes that the Bankruptcy Court's jurisdiction over claims

"arising in" a Title 11 case does not require that the claims be expressly created by the

Bankruptcy Code and that the "related to" jurisdiction of bankruptcy courts enjoys a similarly

broad interpretation. (Commonwealth Br. at 13.) Because the Commonwealth's Proposed

Complaint seeks to preclude Allied from collecting on loans that are void under state law

through bankruptcy proceedings, the Commonwealth contends that its claims fall within the

Bankruptcy Court's subject matter jurisdiction. (Commonwealth Br. at 14.)

Separately, Taylor responds that the Bankruptcy Court appropriately granted the

Commonwealth's Motion to Intervene, because the Commonwealth satisfied the requirements of

Rule 24(b). (Taylor Br. at 34-35.) Taylor adds that Allied had sufficient time to object to the

Commonwealth's Motion, noting that the Bankruptcy Court informed the parties on October 10,

2018 that if the Commonwealth moved to intervene, the Bankruptcy Court would hear such a

motion during the November 15, 2018 hearing. (Taylor Br. at 35.) And Taylor notes that Allied

in fact presented arguments against the Commonwealth's invention, including the arguments that

Allied now raises on appeal, before the November 15, 2018 hearing. (Taylor Br. at 35-36.)

Pursuant to Bankruptcy Rule 7024, Federal Rule of Civil Procedure 24 governs the right

to intervene in a bankruptcy proceeding. In relevant part, Rule 24 provides that any party may

permissively intervene when: (1) the party files a "timely motion" to intervene; (2) the party

"has a claim or defense that shares with the main action a common question of law or fact;" and,

(3) "the intervention will [not] unduly delay or prejudice the adjudication of the original parties'

rights." Fed. R. Civ. P. 24(b)(1)(B), (b)(3).[3] A court's decision to grant or deny permissive

intervention "is particularly deferential," requiring an appellant challenging the court's decision

to demonstrate "a *clear* abuse of discretion." *McHenry v. Comm'r of Internal Revenue*, 677 F.3d

214, 219 (4th Cir. 2012) (emphasis supplied) (quotations and citations omitted); *see also Alt v.*

*U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014) ("[W]e have emphasized that a court's discretion

[in resolving motions to intervene] is 'wide.'" (citations omitted)).

    In determining the timeliness of a motion to intervene, courts must consider "how far the

suit has progressed," "the prejudice that delay might cause other parties," and "the reason for any

tardiness in moving to intervene." *Scardelletti v. Debarr*, 265 F.3d 195, 203 (4th Cir. 2001),

*rev'd on other grounds sub nom. Devlin v. Scardelletti*, 536 U.S. 1, 122 (2002). Among these

factors, "the most important . . . is the prejudice caused to the other parties by the delay." *Hill*

*Phoenix, Inc. v. Systematic Refrigeration, Inc.*, 117 F. Supp. 2d 508, 514 (E.D. Va. 2000) (citing

*Spring Constr. Co. v. Harris*, 614 F.2d 374, 377 (4th Cir. 1980)).

---

[3]      Notably, Rule 24(b)(2) provides that governmental officers and agencies may intervene
in cases where a party's claim or defense "is based on . . . a statute or executive order
administered by the office or agency; or . . . any regulation, order, requirement, or agreement
issued or made under the statute or executive order." Fed. R. Civ. P. 24(b)(2)(A)-(B). The
Virginia Attorney General does not rely on this provision in arguing for permissive intervention.
Indeed, Rule 24(b)(2) requires that the officer or agency seeking intervention "manage[],
direct[], or supervise[] the application" of the statute or executive order on which an original
party bases her claim or defense, and the Virginia Attorney General has not argued as such.
*McHenry*, 677 F.3d at 220. Accordingly, the Commonwealth's Motion to Intervene falls under
Rule 24(b)(1), which provides for the permissive intervention of "anyone."

As for the third factor — undue delay and prejudice to the original parties — because "[a]dding parties to a case almost always results in some delay, . . . delay alone does not mean that intervention should be denied." *Ohio Valley Envtl. Coal., Inc. v. McCarthy*, 313 F.R.D. 10, 30 (S.D. W. Va. 2015) (citations omitted). Instead, "Rule 24(b) requires *undue* delay." *Id.* (emphasis supplied). Ultimately, courts should balance any delay or prejudice threatened by intervention with "the advantages promised by it." *Id.* "Regardless of what a court concludes in considering [the undue delay or prejudice to the original parties], it may still either grant or deny intervention." *McHenry*, 677 F.3d at 222.

Relevant here, a party seeking intervention must also present "an independent ground of subject matter jurisdiction." *Shanghai Meihao Elec., Inc. v. Leviton Mfg. Co.*, 223 F.R.D. 386, 387 (D. Md. 2004). Because the existence of subject matter jurisdiction constitutes a question of law, the Court reviews the subject matter jurisdiction of the Bankruptcy Court *de novo*. *Owens-Ill., Inc. v. Rapid Am. Corp.* (*In re Celotex Corp.*), 124 F.3d 619, 625 (4th Cir. 1997). Notably, subject matter jurisdiction includes determinations of standing. *In re Rivada Networks*, 230 F. Supp. 3d 467, 471 (E.D. Va. 2017).

Because Allied does not challenge the Bankruptcy Court's finding that the Commonwealth filed a timely motion to intervene and that intervention would not unduly delay or prejudice the adjudication of the original parties' rights, the Court will focus its review on Allied's primary contention: that the Bankruptcy Court improperly granted the Commonwealth's Motion to Intervene, because the Commonwealth lacked standing to sue and because the Bankruptcy Court lacked subject matter jurisdiction over the Commonwealth's Proposed Complaint. (Allied Br. at 43-48.)

1.     *The Commonwealth Has Standing to Intervene.*

As for the Commonwealth's standing to intervene, the Fourth Circuit's holding in

*Edmond v. Consumer Protection Division (In re Edmond)*, 934 F.2d 1304 (4th Cir. 1991), proves

instructive. In *Edmond*, the Fourth Circuit considered the standing of the Consumer Protection

Division of Maryland's Office of the Attorney General (the "Division") in an adversary

proceeding before the Bankruptcy Court for the District of Maryland. 934 F.2d at 1309.

Specifically, Edmond argued that because the Division failed to certify a specific class of

consumers in its adversary proceeding to forestall discharge, the Division lacked standing to sue.

*Id.* In rejecting Edmond's argument, the Fourth Circuit recognized that "[t]he concept of *parens*

*patriae* (translated "father of the country") gives a state standing to sue when the state seeks to

protect a quasi-sovereign interest." *Id.* at 1310. The Fourth Circuit noted that *parens patriae*

standing requires that the state be "more than a 'nominal party without a real interest of its own'"

and that the state "'articulate an interest apart from the interests of particular private parties.'"

*Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 600, 607

(1982)). Otherwise, states may vindicate their quasi-sovereign interests, including "'the health

and well-being — both physical and economic — of [their] residents in general.'" *Id.* (quoting

*Alfred L. Snapp & Son*, 458 U.S. at 607). And the Fourth Circuit instructed that although the

injury from the activity challenged by the state "must affect more than an identifiable group of

individual residents, indirect effects of the injury may be considered" to determine standing. *Id.*

(internal quotations omitted).

Applying these principles, the Fourth Circuit found that the Division had standing to sue

in the bankruptcy proceeding. *Id.* The Fourth Circuit highlighted two aspects of Maryland's

Consumer Protection Act that made "explicit that the Division acts on behalf of the state's quasi-

28

sovereign interest when it pursues actions under the Act." *Id.* First, Maryland's Consumer

Protection Act authorized the Division to initiate administrative hearings to obtain cease and

desist orders "'on its own initiative'" and "'in the absence of consumer complaints.'" *Id.*

(quoting *Consumer Protection Div. v. Consumer Pub. Co.*, 501 A.2d 48, 62 (Md. 1985)).

Second, the Act further authorized the Division to disgorge any benefits from a violator without

proving individual injury to Maryland consumers. *Id.* at 1310-11 (citing *Consumer Pub. Co.*,

501 A.2d at 73-74). The Fourth Circuit interpreted these provisions as embodying "a broad state

interest in protecting all consumers, present and future," and the Fourth Circuit cited to other

decisions finding that attorneys general could sue in bankruptcy proceedings pursuant to

consumer protection statutes. *Id.* at 1311 (citing *Kelley v. Sclater* (*In re Sclater*), 40 B.R. 594,

597 (Bankr. E.D. Mich. 1984) and *Abrams v. DeFelice* (*In re DeFelice*), 77 B.R. 376, 380

(Bankr. D. Conn. 1987)).

 Here, in its Proposed Complaint, the Commonwealth sets forth one count for relief,

alleging that Allied's open-end credit plans did not meet the requirements of Virginia's open-end

credit statute, Va. Code § 6.2-312, and therefore constituted usurious loans issued without a

consumer finance license in violation of § 6.2-1501. (Proposed Compl. ¶¶ 60-69.) Based on

Allied's alleged violations of Virginia's consumer finance statutes, the Virginia Attorney

General, on behalf of the Commonwealth, seeks to: (1) nullify and void the open-end credit

plans issued by Allied between July 28, 2013 and July 24, 2017; (2) enjoin Allied from

attempting to collect on those plans or from further violating the relevant statutes; (3) disgorge

Allied of the principal, interest and charges paid on such plans pursuant to §§ 6.2-1537(C) and

6.2-1541(B), with the funds paid to the Commonwealth as trustee; and, (4) award fees and costs

to the Commonwealth. (Proposed Compl. ¶¶ 25, 70, Prayer for Relief.)

The Court finds that the Virginia Attorney General had standing to intervene on behalf of the Commonwealth, because it sought to vindicate quasi-sovereign interests entrusted to its charge. Indeed, like Maryland's Consumer Protection Act in *Edmond*, Virginia's Consumer Finance Act ("CFA") authorizes the Virginia Attorney General to bring suit in the name of the Commonwealth on its own initiative and in the absence of any consumer complaints. Va. Code § 6.2-1537(A). Although the provision refers to the Attorney General's duty to bring suit in the Circuit Court for the City of Richmond, the provision nonetheless evinces Virginia's "broad state interest in protecting all consumers, present and future." *Edmond*, 934 F.2d at 1311. Section 6.2-1537 also provides that the Virginia Attorney General may, in the name of the Commonwealth, seek restitution from violators of the CFA, with no requirement that the amounts be paid to specific consumers. § 6.2-1537(C). And the CFA reserves the right of individual consumers to bring causes of action separate from the Commonwealth, further establishing that the General Assembly intended to provide the Attorney General with a broader interest in enforcing the CFA than the interest possessed by individual consumers. § 6.2-1537(E).

Moreover, the statutes establishing the Virginia Attorney General's Office provide that the Attorney General shall conduct all litigation in civil matters in which any "state department, institution, division, commission, board, bureau, agency, entity, official, court, or judge . . . [is] interested." Va. Code § 2.2-5107. To that end, the CFA establishes the interests of the State Corporation Commission ("SCC") in preventing unlicensed and usurious lending to Virginia consumers. *See* §§ 6.2-1501(A) (requiring that any business making personal loans to consumers with interest exceeding the usury cap first obtain a license from the SCC), 6.2-1507(A) (empowering the SCC to investigate applicants for a consumer finance license and to

deny applications that fail to meet the enumerated criteria, including that the applicant has the

appropriate "financial responsibility, experience, character and general fitness . . . to command

the confidence of the public"), 6.2-1511 (empowering the SCC to revoke the license of any

entity who knowingly or negligently violates the Consumer Finance Act), 6.2-1530 (empowering

the SCC, in relevant part, to investigate "the loans, books and records of any person . . . engaged,

or [who] appears to the Commission to be engaged, in a business for which the person is required

to be licensed and supervised under this chapter . . . [or who] the Commission has reason to

believe is violating any provision of this chapter"), 6.2-1531 (empowering the SCC to examine

the books of any licensee under the Consumer Finance Act "as often as it deems to be in the

public interest"), 6.2-1535 (empowering the SCC to adopt regulations "to effect the purposes of

this chapter"), 6.2-1543 (empowering the SCC, on its own initiative, to impose a civil penalty

upon any licensee found to knowingly or negligently violate the CFA).  Thus, in moving to

intervene on behalf of the Commonwealth, the Virginia Attorney General clearly sought to

vindicate the quasi-sovereign interests of both the Attorney General's Office and the SCC in

protecting the economic well-being of Virginia's consumers.  Accordingly, the Commonwealth

has standing to intervene.

     **2.**    ***The Bankruptcy Court Had Subject Matter Jurisdiction over the Commonwealth's Proposed Complaint.***

Allied further contends that the Bankruptcy Court lacked subject matter jurisdiction over

the Commonwealth's Proposed Complaint, because: (1) Virginia Code § 6.2-1537(A) provides

that the Attorney General must bring enforcement actions under the CFA in the Richmond City

Circuit Court; and, (2) the Bankruptcy Court lacked jurisdiction under 28 U.S.C. § 157. (Allied

Br. 43-44, 46-48.)  The Court finds both arguments inapposite.

For one, Virginia Code § 6.2-1537(A) requires only that the Virginia Attorney General "institute and prosecute" civil enforcement actions under the CFA in the Richmond City Circuit Court, which, by its terms, does not prevent the Attorney General from intervening in a legal action raising issues under the CFA. Indeed, to read § 6.2-1537(A) as preventing the Virginia Attorney General from intervening in any consumer finance lawsuit would conflict with the Attorney General's statutory duty to represent the Commonwealth and its agencies in "all civil litigation in which any of them are interested." Va. Code § 2.2-507(A); *see also Cox v. Oakwood Mining, Inc.*, 434 S.E. 2d 904, 969 (Va. Ct. App. 1993) ("It is well established that a statute should be construed with a view toward harmonizing it with other statutes and consistent with fundamental law, especially when no violence is done to the language of the statute and such interpretation satisfies its terms." (internal quotations omitted)). Intervention exists, at least in part, to allow parties to have a voice in litigation in which they have an interest, so the Court will not read § 6.2-1537(A) to be so limiting. *See Am. Humanist Ass'n v. Maryland-Nat'l Capital Park & Planning Comm'n*, 303 F.R.D. 266, 270 (D. Md. 2014) (noting that although permissive intervention does not require that the movant establish an interest in the litigation, a strong interest in the subject matter of the litigation weighs in favor of granting intervention). Furthermore, to the extent that Allied argues that, in enacting § 6.2-1537, the General Assembly "manifested an intention to strip the federal courts of jurisdiction to hear the claims now advanced by the Commonwealth," (Allied Br. at 44), the Court notes that Article III grants Congress — not Virginia's General Assembly — the power to establish the jurisdiction of the federal courts, U.S. Const. art. III, § 1.

The Court likewise finds that the Bankruptcy Court has subject matter jurisdiction over the Commonwealth's Proposed Complaint pursuant to 28 U.S.C. § 157. The jurisdiction of

bankruptcy courts, "like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). To that end, 28 U.S.C. § 1334(a) provides that "[e]xcept as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(b) further provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Within these jurisdictional limits, pursuant to 28 U.S.C. § 157(a), "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for this district." This District has utilized § 157(a) to confer jurisdiction on the Bankruptcy Court to the full extent permitted by law. (General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.) Therefore, the Bankruptcy Court has subject matter jurisdiction over every civil proceeding "arising under" Title 11, "arising in" Title 11 or "related to" a case "arising under" Title 11.

"A claim 'aris[es] under Title 11' if it is a cause of action created by the Bankruptcy Code, and which lacks existence outside the context of bankruptcy." *Educ. Credit Mgmt. Corp. v. Kirkland (In re Kirkland)*, 600 F.3d 310, 316 (4th Cir. 2010) (citing *Aheong v. Mellon Mortg. Co. (In re Aheong)*, 276 B.R. 233, 242-46 (B.A.P. 9th Cir. 2002)). By comparison, "[a] proceeding or claim 'arising in' Title 11 is one that is 'not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy.'" *Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 835 (4th Cir. 2007) (quoting *Grausz v. Englander*, 321 F.3d 467, 471 (4th Cir. 2003) (internal quotations omitted)). In other words, a

claim "arises in" Title 11 when "'it would have no practical existence *but for* the bankruptcy.'" *Id.* (quoting Grausz, 321 F.3d at 471 (emphasis supplied) (internal quotations omitted)).

Finally, a bankruptcy court may exercise subject matter jurisdiction over any claim "related to" a case under Title 11. To determine whether a claim relates to a case under Title 11, the Fourth Circuit "has adopted the test articulated by the Third Circuit in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)." *Id.* at 836. Pursuant to that test, a bankruptcy court may exercise "related to" jurisdiction over proceedings, the outcome of which "*could conceivably have any effect on the estate being administered in bankruptcy.*" *Pacor, Inc.*, 743 F.3d at 994 (emphasis supplied). "Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.* That said, "related to" jurisdiction does not extend to "controversies with third parties who are otherwise strangers to the civil proceeding and to the parent bankruptcy." *Id.* (internal quotations and citations omitted).

Here, the Bankruptcy Court made no direct findings regarding its jurisdiction over the Commonwealth's Proposed Complaint. However, the Bankruptcy Court may clearly exercise subject matter jurisdiction over the Commonwealth's claims, because they arose in Title 11 or relate to a case under Title 11. First, to the extent that the Commonwealth's Proposed Complaint seeks to enjoin Allied from collecting on its allegedly unlawful loans through proofs of claim against bankruptcy debtors, the Commonwealth's claims arise in Title 11, because they would have no possible existence outside of a bankruptcy proceeding.

34

Moreover, to the extent that the Commonwealth seeks to invalidate Allied's open-end credit plans beyond the bankruptcy claims process, those claims relate to Taylor's bankruptcy case, because the outcome of the Commonwealth's claims "could alter [Taylor's] rights, liabilities, options, or freedom of action (either positively or negatively)" and would impact "the handling and administration of [Taylor's] bankrupt estate" by affecting the Allied's right to claim against it. *Pacor, Inc.*, 743 F.3d at 994. And the fact that the Commonwealth brings its claims in the interest of the public does not preclude the Bankruptcy Court from exercising jurisdiction, for the Fourth Circuit and other courts have confirmed the ability of states to bring similar claims in the bankruptcy context. *See, e.g., Edmond*, 934 F.2d at 1309-13 (holding that consumer protection division of Maryland Attorney General's Office could bring adversary proceeding against debtor to forestall discharge in interest of public); *DeFelice*, 77 B.R. at 377-81 (holding that New York Attorney General could bring claim for injunctive relief, restitution, damages and costs against debtor on behalf of public); *Sclater*, 40 B.R. at 595-97 (holding that Michigan Attorney General could bring complaint against debtor under Michigan Consumer Protection Act to exempt certain claims from discharge).

In any case, should the Commonwealth's claims at some point exceed the jurisdiction of the Bankruptcy Court, Allied may move to dismiss those claims as improper. But such a possibility does not prevent the Bankruptcy Court from exercising jurisdiction over the Commonwealth's Proposed Complaint to the extent that it has the statutory ability to do so. Accordingly, the Court finds that the Commonwealth possessed an independent ground of subject matter jurisdiction that permitted the Commonwealth to intervene in the Bankruptcy Court.

**3.** **The Bankruptcy Court Did Not Abuse Its Discretion in Granting the Commonwealth's Motion to Intervene.**

Having resolved Allied's arguments concerning the jurisdictional barriers to the Commonwealth's intervention, the Court will review the Bankruptcy Court's decision to grant the Commonwealth's Motion to Intervene for a clear abuse of discretion. *McHenry*, 677 F.3d at 219. To that end, the Court finds no clear abuse of the Bankruptcy Court's discretion. For one, the Court agrees with the Bankruptcy Court that the Commonwealth timely filed its Motion to Intervene, in part, because the Commonwealth filed its Motion before Allied filed its Answer to the Amended Complaint, before the start of discovery and before the Bankruptcy Court scheduled a trial date. *Allied II*, 2019 WL 103775, at *2. The Court also agrees that the Commonwealth's intervention would not cause a prejudicial delay, because the Commonwealth instituted "an almost identical state court lawsuit" against Allied before the initiation of the adversary proceeding, allowing the Commonwealth to intervene without requiring Allied to prepare a new defense. *Id.* Moreover, the Court finds that the Commonwealth's Proposed Complaint shared common questions of law and fact with Taylor's Amended Complaint, satisfying Rule 24(b)(1)(B).

As for Allied's contention that, because the Commonwealth had instituted a nearly identical suit against Allied in state court, the Bankruptcy Court should have denied the Commonwealth's Motion to Intervene in the interest of judicial economy, comity between the federal and state courts and the avoidance of inconsistent results, the Court finds such an argument unpersuasive. (Allied Br. at 42-43.) Allied argument relies primarily on the Supreme Court's holding in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). (Allied Br. at 43.) In relevant part, the Supreme Court in *Colorado River* recognized that jurisprudential and federalism principles could justify a federal court refusing to exercise

36

jurisdiction when a state court has concurrently exercised its jurisdiction over parallel claims. 424 U.S. at 817-18. However, the Supreme Court also noted that "the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention." *Id.* at 818. The Supreme Court instructed that such "limited" circumstances might exist when, for example, a state court has first assumed jurisdiction over a dispute involving property. *Id.* And the Supreme Court explained that courts should also consider the inconvenience of the federal forum, the avoidance of piecemeal litigation and the order in which the concurrent forums obtained jurisdiction, though "only the clearest of justifications will warrant dismissal." *Id.* at 818-19.

Considering these factors, the Court finds that the Bankruptcy Court did not abuse its discretion in granting the Commonwealth's Motion to Intervene. Indeed, the fact of the Commonwealth's concurrent enforcement action against Allied in state court does not present the "clearest of justifications" to warrant dismissal. Although the Commonwealth presents nearly identical claims against Allied in both fora, the Commonwealth's Proposed Complaint also seeks to prevent Allied from collecting on its allegedly unlawful loans in bankruptcy proceedings, which occur only in federal court. In so doing, as the Bankruptcy Court noted, the Commonwealth's intervention reduces the risk of inconsistent results between federal and state court by allowing the Commonwealth to present its arguments against the nature and validity of Allied's open-end credit plans in the context of bankruptcy cases, including Taylor's case, or to otherwise represent the Commonwealth's interests in both fora. *Allied II*, 2019 WL 103775, at *2.

Ultimately, because the Bankruptcy Court has jurisdiction to resolve the Commonwealth's claims in intervention, and because the Bankruptcy Court did not clearly abuse its discretion in otherwise granting the Commonwealth's Motion to Intervene, the Court affirms the Bankruptcy Court's decision to grant the Motion.[4]

## IV.  CONCLUSION

For the reasons set forth above, the Court AFFIRMS the decisions of the Bankruptcy Court as to both Allied's Motion to Compel and the Commonwealth's Motion to Intervene and DENIES AS MOOT Taylor's Motion to File Supplemental Authority (ECF No. 18).  An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: October 22, 2019

---

[4]     The Court also rejects Allied's first assignment of error — that it had insufficient time to object to the Commonwealth's Motion to Intervene — because the record clearly reflects that during an October 10, 2018 pre-trial conference, the Bankruptcy Court informed all of the parties that it would entertain a motion to intervene by the Commonwealth during the November 15, 2018 hearing.  (Order (Adv. Pro. No. 18-03003, ECF No. 102) at 1 n.1.)  Moreover, Allied now raises the same arguments on appeal that it raised in its Preliminary Objection to the Commonwealth's Motion, suggesting that the lack of additional time to object did not prejudice Allied.  (Prelim. Obj. at 2-5.)  And, in any case, the Bankruptcy Court did not abuse its discretion even after considering Allied's fully matured arguments.